[Cite as *State v. Greer*, 2024-Ohio-694.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

CASE NO. 1-23-01

  v.

TAROCKIS L. GREER,

O P I N I O N

    DEFENDANT-APPELLANT.

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR 2021-0268**

**Judgment Affirmed**

**Date of Decision:  February 26, 2024**

APPEARANCES:

    *William T. Cramer* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**ZMUDA, J.**

{¶1} Defendant-appellant Tarockis L. Greer ("Greer") appeals the judgment of the Allen County Court of Common Pleas, alleging that his convictions were against the manifest weight of the evidence. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} At 8:50 A.M. on July 12, 2021, Patrolman Scott Luedeke ("Patrolman Luedeke") of the Lima Police Department received a report that a gun was fired in a residential area on West Wayne Street and that a person was seen fleeing from this location. Tr. 119. Ex. 46. When he arrived at the scene, Patrolman Luedeke encountered three people who were identified as Robbie Blevins ("Blevins"), Jodi Troy ("Troy"), and Jason High ("High"). Tr. 120-121. Troy had a head injury and initially reported that she did not know what had happened. Ex. 54. High reported that "[h]e believed he might have been pistol whipped in the back of the head." Tr. 121. However, Blevins, Troy, and High did not identify the person who caused these injuries while Patrolman Luedeke was present. Tr. 125. Ex. 54.

{¶3} Detective Steven J. Stechschulte, Jr., ("Detective Stechschulte") of the Lima Police Department arrived on the scene shortly thereafter and examined the premises. Tr. 236. The investigators located a spent shell casing in the vicinity of a bullet hole that was discovered in the floor of the living room. Tr. 211. They also located a second spent shell casing in an upstairs bedroom that was in the vicinity

of a bullet hole in the bedroom wall. Tr. 211, 217. One bullet was recovered during this investigation and sent to the Ohio Bureau of Criminal Investigation for testing along with the two shell casings from the house. Tr. 241. Detective Stechschulte then conducted several interviews as part of this investigation. Tr. 244.

{¶4} Blevins spoke with Detective Stechschulte and later gave his account of what had transpired at trial. He testified that he had known Troy for about four years and had spent the night of July 11, 2021 at her house on West Wayne Street. Tr. 150, 152. After Blevins woke up the next morning, Greer visited the house with Durand Tyson ("Tyson"). Tr. 155-156. Blevins, Troy, Tyson, and Greer then sat down in the living room while High was sleeping in a bedroom upstairs. Tr. 157. After using some of the drugs that Tyson had brought, Blevins decided to leave. Tr. 157, 163. Blevins testified that he went upstairs to get some tools that he had lent to High, though he ultimately did not obtain these items. Tr. 157.

{¶5} Blevins testified that, as he was walking down the stairs, Greer was walking up the steps towards the second floor. Tr. 158-159. Blevins further testified that, once he reached the first floor, no one was in the living room and that he then heard the sound of a gunshot coming from the upstairs. Tr. 159. In response, he ran outside of the house and towards his car across the street. Tr. 158. Blevins drove his car onto a side street and then saw Greer and Tyson exit the house together. Tr. 160.

{¶6} From his vantage point, Blevins observed Greer and Tyson get into a white van and drive away. Tr. 160. He also saw High crawl out of a second story window and onto the roof before crawling back through the window and into the house. Tr. 161. Blevins stated that he then went back inside the house where he saw Troy on the ground with a "big ole gash" in her head. Tr. 161-162. He testified that Troy appeared "stunned" and told him that she had been "hit in the head with a gun." Tr. 162.

{¶7} High was also interviewed by Detective Stechschulte and later gave his account of what had transpired at trial. Tr. 244. High testified that he had been partying at Troy's house until he went to sleep at 4:00 A.M. on the morning of July 12, 2021 in one of her upstairs bedrooms. Tr. 171. When he woke up several hours later, he saw Greer pointing what appeared to be a Glock handgun at him. Tr. 172. High testified that Greer said, "I want to get high, too. Where's it at?" Tr. 173.

{¶8} High stated that he responded by acting as though he did not "have anything" of value and that Greer then "smack[ed]" him on the left side of his head with the handgun. Tr. 173. High then complied when Greer ordered him to get out of bed. Tr. 174. After removing a few hundred dollars from High's pockets and taking High's cell phone from the bed, Greer began backing towards the bedroom door. Tr. 174-175. According to High, Greer pointed the gun directly at him and fired a shot. Tr. 175. The bullet missed High and struck the bedroom wall. Tr. 175.

{¶9} High testified that, after Greer went downstairs, Troy began yelling before he heard the sound of a gunshot. Tr. 176-177. Believing that Troy may have been "killed," High sought to escape by getting out of the bedroom window and onto the roof above the front porch. Tr. 177. However, he decided to reenter the house after saw Greer and Tyson walk outside, get into a white minivan, and drive away. Tr. 178-179. High testified that he went downstairs where Troy was "hysterical" and "flipped out." Tr. 179. Troy stated that she had been hit on the head with the gun. Tr. 179. High also represented that Blevins then reentered the house. Tr. 179.

{¶10} During one of these interviews, Detective Stechschulte was notified that High's cellular phone had been located near the intersection of Faurot Avenue and Nye Street. Tr. 245. Troy's cellular phone had also been reported as stolen that morning but was never recovered. Tr. 245, 264. While High was able to give Greer's name to the police, Detective Stechschulte conducted a photo lineup with Blevins to determine whether he was able to identify Greer in a picture. Tr. 246, 255. Blevins ultimately selected a photo of Greer, stating that "he was eighty percent confident" that the picture depicted the person he had witnessed with Tyson at the West Wayne Street house. Tr. 246.

{¶11} Based on this information, Detective Stechschulte contacted a friend of Greer named Dwayne Wilson-Smith ("Wilson-Smith"), who agreed to cooperate with the police investigation. Tr. 247. After being fitted with a recording device,

Smith spent some time speaking with Greer while they drove around town together on July 13, 2021. Tr. 189. After receiving this recording from Wilson-Smith, the police sought arrest warrants for Greer and Tyson. Tr. 250.

{¶12} The police learned that Greer was at the house where the mother of his children, Chastity, lived. Tr. 251. When the police arrived, Greer was working on Chastity's white minivan. Tr. 251-252. After explaining that a search warrant for the house was forthcoming, Greer directed Chastity to go inside and get a handgun. Tr. 251. Chastity did as instructed, bringing a "Glock 23 .40 caliber handgun" to the officers. Tr. 252. Subsequent testing established that this Glock handgun had fired the two spent shell casings that were discovered in Troy's house. Tr. 232.

{¶13} Tyson eventually gave an account of what had transpired on the morning of July 12, 2021 and testified as a witness for the State at trial. He stated that he was Greer's uncle and that Greer referred to him as "Unk." Tr. 147. Tr. 130, 143-144. On July 12, 2021, Greer came to his house, and they got into the minivan that Greer had driven there. Tr. 130, 131, 144. Tyson testified he was smoking marijuana while Greer was drinking alcohol. Tr. 131. At some point, they decided to visit Troy's house and traveled to West Wayne Street in the minivan. Tr. 132, 133. Once inside Troy's house, Tyson sold some cocaine for twenty dollars. Tr. 135. Tyson, Blevins, and Troy then used cocaine together. Tr. 135.

{¶14} Tyson testified that Blevins went upstairs to retrieve some money to buy more cocaine and that Troy indicated that she was going to the basement to do

some laundry. Tr. 135-137. Tyson followed Troy into the basement. Tr. 137. While they were downstairs, Tyson heard a gunshot and a scream. Tr. 137. Troy went up the stairs to the main floor while Tyson lingered in the basement. Tr. 138. Tyson testified that, after a few minutes, he decided to go upstairs. Tr. 138. When he reached the main floor, Tyson saw Greer descending the stairs that led to the second floor. Tr. 138. Troy was walking down the stairs in front of Greer, who had a gun pointed at the back of Troy's head. Tr. 138.

{¶15} Tyson testified that Greer pointed the gun at him and that Troy fell to the ground. Tr. 139. Tyson said, Greer "pointed the gun back at her [Troy]. He pointed the gun back at me. He shoots to the ground. Pow. He points at me and says * * * 'You come with me.'" Tr. 139. In response, Tyson left the house and headed towards the minivan with Greer. Tr. 139-140. He stated that Greer knocked out one of the van windows, "jumped in," and then unlocked the door. Tr. 140. Tyson then got into the minivan, and Greer drove away. Tr. 140. Tyson testified that he got out of the vehicle after Greer had parked the minivan at "Eureka and Nye Street." Tr. 140.

{¶16} On September 16, 2021, Greer was indicted on one count of aggravated burglary in violation of R.C. 2911.11(A)(2), a first-degree felony; one count of aggravated robbery in violation of R.C. 2911.01(A)(1), a first-degree felony; and two counts of felonious assault in violation of R.C. 2903.11(A)(2), second-degree felonies. Each of these four charges carried a three-year firearm

-7-

specification under R.C. 2941.145(A). A jury trial on these charges was held on November 1 and November 2, 2022. Blevins, High, Wilson-Smith, Tyson, Patrolman Luedeke, and Detective Stechschulte testified as witnesses for the State.

**{¶17}** A transcript of the recorded conversation between Wilson-Smith and Greer was admitted at trial. This transcript contained the following statements:

Greer: He was sleep. I don't give a f**k n***a'. I do s**t how I do s**t.

Wilson-Smith: Out for the blood, when you start doing that though? * * * What he do?

Greer: N***a woke up

* * *

Greer: He was like, come on man.

* * *

Greer: I said, where the f**k that mutha' f**kin' dope at. I said, I want to get high too. Because I thought he didn't know me.

* * *

Greer: I was like, I want to get high too, where the dope at.

* * *

Greer: * * * Unk came and got me and said, I got a sweet one

Greer: He like n***a', gut go in there and do you. I'm like, alright n***a' don't be . . . My n***a', I . . . (Unintelligible) . . . at Unk before we left that b***h and made him come with me

Greer: * * * The neighbors the ones who called the police.

Wilson-Smith: Right, right

Greer: I threw all the phones in the river over there.

\* \* \*

Greer: \* \* \* Like I told Unk, he the one I ain't even trippin' about nothing with whoever saying what. Like I told Unk, he the one scared. He talking about they looking for us. I said, what? \* \* \*

\* \* \*

Greer: Ask Unk, I had a K in the car n***a'. I had a 40 with me. The K was in the car the whole time, n***a' on my kid. \* \* \*

\* \* \*

Greer: Come on n***a, I blew that b***h right by him. BOW! Get your b***h a*s up and get down on the floor. I blew that b***h in the arm of the couch. BOW! Get your b***h a*s up, you coming with me. Come on. On everything. I came down there right after I blew and uh smack dude with the gun. Of course he gone get around anybody n***a' and talk stuff my n***a'

Wilson-Smith: Right, right

Greer: Anyways, mutha' f***kin' soon as I came downstairs, I hit the b***h with the butt of that b***h. Sit you're a*s down b***h, where the (unintelligible) at?

\* \* \*

Greer: the b***h that live there, the old white n***a', them two don't know me and the dude upstairs, that was it.

Greer: \* \* \* But n***a' I thought I locked the keys in the car and I didn't. They was in my pocket the whole time so I jumped through the back van window. The whole b***h fell off. It ain't break or nothing. I picked that b***h up and got straight in the car. I pulled off slow as f**k n***a'. \* \* \*

* * *

Greer: I'm the one doing the robbery. F**k you talking about? He can't get me on nothing his b***h a*s scared to do because if he wasn't scared to do it, he would've did it by hisself. He needed me. I ain't need him. He took his a*s downstairs the whole time n***a'. I went up there. I don't need no crowd n***a'. Hold up (Makes clicking sound) soon as ol' girl went to the bathroom, I walked straight. He was like Blam-blam! Exactly what Unk did, he was like, Blam-blam! (Laughs) He did this, look, he was like this Blam-blam and pointed upstairs.

Ex. 45. Portions of this recorded conversation between Wilson-Smith and Greer were also played at trial. Tr. 192. Ex. 44.

{¶18} After the State rested, Greer testified in his own defense. He stated that he had never been in Troy's house on West Wayne Street. Tr. 275. He also stated that he had never seen High, Troy, or Blevins in his life but admitted that he knew Tyson. Tr. 275-276. Greer also affirmed that he was "just talking smack" in the recorded conversation that he had with Wilson-Smith. Tr. 281.

{¶19} Greer then gave an account of what transpired on July 12, 2021. He testified that Tyson had called him to ask for a favor. Tr. 281. According to Greer, Tyson had been using cocaine for a few days and needed someone to provide an alibi to his girlfriend. Tr. 282. Greer was asked to tell Tyson's girlfriend that Tyson had been at Greer's house during the days in which Tyson had been using cocaine. Tr. 283. After agreeing to provide this alibi, Greer got into a black car driven by Tyson to go to the girlfriend's house. Tr. 283. On entering the vehicle, Greer

noticed that Tyson was carrying a gun. Tr. 284. Since Greer was on probation, Tyson put the handgun in the trunk of the vehicle. Tr. 285.

**{¶20}** Greer testified that they went to see Tyson's girlfriend, but when they were leaving her house, Tyson realized that his vehicle was out of gas. Tr. 285-286. Tyson then called his friend, Ed, and asked him to give them a ride. Tr. 286. Ed picked Tyson and Greer up in a white van. Tr. 286. Greer was in the back seat of the minivan and could not hear what Ed and Tyson were saying to each other. Tr. 288. Ed drove the van to a place on Wayne Street or Elm Street. Tr. 287. After parking the van, Ed and Tyson went into a house with a gun while Greer waited in the vehicle. Tr. 288-289. Greer stated that he fell asleep while he was waiting for them to return. Tr. 289.

**{¶21}** Greer stated that he woke up when Ed and Tyson came rushing back to the minivan. Tr. 289. Since Greer locked the doors, Ed pushed one of the windows out in order to enter the van. Tr. 290. As Ed drove away, Tyson told him to go faster. Tr. 290. Greet testified that, when Tyson asked him to throw a phone out of the window, he refused and that Tyson then threw the phone out of the window himself. Tr. 291. Greer stated that, after they arrived at Chastity's house, Tyson asked if he could store his gun there. Tr. 292. Greer refused to store the gun for Tyson and then went inside to tend to one of his children. Tr. 292.

**{¶22}** Greer further testified that Tyson called him later and said that he had stashed the gun under the back porch of Chastity's house. Tr. 293. Greer stated

that he then hid the gun in the ceiling tiles above the porch so that his children could not access it. Tr. 293. He testified that he told Tyson to retrieve his gun but that Tyson never came. Tr. 294. Chastity later discovered the gun when it fell through the ceiling and onto the floor. Tr. 294. Greer then stored the handgun in a kitchen cabinet where it was located when the police arrested him. Tr. 295.

**{¶23}** On November 2, 2022, the jury returned verdicts of guilty on all four charges against Greer and on the corresponding gun specifications. The trial court issued its judgment entry of sentencing on December 6, 2022.

*Assignment of Error*

**{¶24}** Greer filed his notice of appeal on January 3, 2023. On appeal, he raises the following assignment of error:

> **Appellant's convictions are against the manifest weight of the evidence.**

In particular, he questions the credibility of the witnesses who identified him as the perpetrator of the offenses at the West Wayne Street house.

*Legal Standard*

**{¶25}** A manifest-weight challenge asserts that the verdict is not supported by the greater amount of credible evidence. *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 12.

> On appeal, courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a

manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, 104 N.E.3d 202, ¶ 36 (3d Dist.), quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997).

**{¶26}** In this process, "the appellate court sits as a 'thirteenth juror' and examines conflicting testimony." *State v. Bush*, 2023-Ohio-4473, --- N.E.3d ---, ¶ 138 (3d Dist.), quoting *Thompkins* at 387. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, 982 N.E.2d 111, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

**{¶27}** Further, "the credibility of witnesses is primarily a determination for the trier of fact." *State v. Morris*, 2022-Ohio-3608, 198 N.E.3d 1024, ¶ 41 (3d Dist.), quoting *State v. Banks*, 8th Dist. Cuyahoga No. 96535, 2011-Ohio-5671, ¶ 13. As the trier of fact, a jury "is free to believe all, some, or none of the testimony of each witness appearing before it." *Harvey* at ¶ 47, quoting *State v. Houdeshell*, 3d Dist. Hancock No. 5-18-02, 2018-Ohio-5217, ¶ 39. Thus, "[a] verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Hooper*,

3d Dist. Allen No. 1-21-35, 2022-Ohio-2990, ¶ 29, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

**{¶28}** For these reasons, "[a] reviewing court must * * * allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

*Legal Analysis*

**{¶29}** Greer asserts that the evidence that the State introduced to establish that he was present at Troy's house during the commission of the crimes was not credible and that his convictions are, therefore, against the manifest weight of the evidence. We turn to examining Greer's arguments about the trial testimony from the witnesses who were present during the incident, the recorded conversation obtained by Wilson-Smith, and the physical evidence presented at trial.

**{¶30}** First, three people who were present at Troy's house on the morning of July 12, 2021 testified at trial and identified Greer as being present during the incident. Tr. 129-130, 155-156, 172. The first of these witnesses, Tyson, also stated that he saw Greer point a gun at Troy and fire a shot while on the main floor of

Troy's house. Tr. 138-139. Tyson testified that he is Greer's uncle and has known Greer for over a decade.[1] Tr. 131, 143. He also testified that he and Greer had gone to a gathering at Troy's house roughly one week before the incident. Tr. 145.

{¶31} During his testimony, Tyson did admit that he was incarcerated at the time of trial; had felony convictions on his record; and was charged for his involvement in this incident at Troy's house. Tr. 129. He specified that he was not testifying at trial pursuant to any agreement with the State. Tr. 141. Rather, he voluntarily chose to testify to "clear * * * [his] name." Tr. 142. He indicated that he had been in a physical altercation with Greer five or six years prior to trial. Tr. 143. His testimony also indicated that he had used cocaine and marijuana the morning of the incident at Troy's house. Tr. 131, 135. Greer also testified that Tyson was a gang member and a drug addict. Tr. 278, 284.

{¶32} Next, Blevins testified that he saw Greer go up the stairs at Troy's house just before he heard a gunshot. Tr. 158-159. He stated that he was in the first floor with Greer before the incident and that he had previously seen Greer during a gathering at Troy's house roughly week prior to July 12, 2021. Tr. 154-155, 166. After the incident, Blevins was able to identify a picture of Greer during a photo lineup conducted by Detective Stechschulte. Tr. 166.

---

[1] Greer disputes whether Tyson is, in fact, his uncle. Tr. 143.

**{¶33}** When Detective Stechschulte testified, defense counsel questioned him about the accuracy of Blevins's photo lineup identification. Detective Stechschulte indicated that Blevins narrowed the photo lineup down to two pictures. Tr. 260-261. However, Blevins then pointed at one of the pictures and stated that he was eighty percent sure that this photo depicted Greer. Tr. 246, 261. The picture that he expressed eighty percent certainty about was the one that depicted Greer. Tr. 246. Detective Stechschulte noted that the picture of Greer that was used in the lineup was several years old and that Greer's hair was styled differently at the time that the photo was taken. Tr. 260-261.

**{¶34}** During his testimony, Blevins also admitted that, prior to the incident, he had used some illegal drugs that Tyson had brought to Troy's house. Tr. 157. However, he testified that he was not high by the time of the incident and that the drugs that Tyson brought did not "phase" him. Tr. 163. He also indicated that he had been partying at Troy's house the night before the incident but woke up with a clear mind on the morning of July 12, 2021. Tr. 152.

**{¶35}** At trial, High also identified Greer as the person who took money from his pockets at gunpoint and fired a shot that struck the bedroom wall. Tr. 174-175. He testified that he had met Greer one time at a gathering that occurred at Troy's house one or two weeks prior to the incident. Tr. 182. High stated that he met Greer through Wilson-Smith. Tr. 182.

{¶36} At the time of trial, High was incarcerated, having been convicted of trafficking in cocaine. Tr. 169. He testified that he was not high at the time his money had been stolen but had used illegal drugs the night before the incident. Tr. 183. However, he testified that he had not used illegal drugs for a couple of hours before he went to bed on the morning of July 12, 2021. Tr. 183. On cross-examination, High admitted that he did not initially tell the police who had pointed the gun at him and that he had only heard one gunshot. Tr. 182-183, 185. He then admitted that he lied to the police as he was afraid of getting into trouble. Tr. 183.

{¶37} Greer testified in his own defense at trial. He unequivocally stated that he had never been inside Troy's house and that he had never met Troy, High, or Blevins. Tr. 275-276. His testimony indicated that he had been with Tyson that morning but that another person went with Tyson into the house. Tr. 289. On cross-examination, Greer stated that the witnesses who identified him as the perpetrator of the offenses in the indictment were not telling the truth. Tr. 303. He also stated that Tyson had assaulted him in the past over a family dispute. Tr. 277-278.

{¶38} Second, we turn to examining the recorded conversation between Greer and Wilson-Smith. In this recording, Greer mentioned that he was "the one doing the robbery." Ex. 45. Further, several statements that Greer made align closely with several of the events that Tyson, High, and Blevins described as occurring on July 12, 2021. For example, Greer indicated that he approached a sleeping person and said, "I want to get high too, where the dope at." Ex. 45. At

trial, High testified that Greer woke him up and said, "I want to get high, too. Where's it at?" Tr. 173.

**{¶39}** In his conversation with Wilson-Smith, Greer also mentioned that Tyson was "downstairs the whole time" and that he made "Unk" leave with him. Ex. 45. He also indicated that he jumped through the back window of his vehicle because he thought he had left the keys in the van. Ex. 45. These were details mentioned by Tyson in his trial testimony. Tr. 139, 140. Greer further told Wilson-Smith that he had "a 40 with me" and that he "threw all the phones in the river * * *." Ex. 45. The State introduced evidence that the shell casings recovered at Troy's house were fired by a forty caliber handgun. Tr. 228, 232, 252. Detective Stechschulte also testified that Greer had reportedly stolen two cellular phones, though one of these phones was recovered. Tr. 244.

**{¶40}** Wilson-Smith testified that he believed that he and Greer were discussing what had happened to High on July 12, 2021. Tr. 193. In response, Greer admitted that it was his voice in the recorded conversation. Tr. 303. However, he testified that he was variously talking smack or describing what he "heard happened" to High in this conversation. Tr. 304. He also affirmed that he was not "necessarily referring to the Wayne Street crime" and was speaking of other situations involving other individuals. Tr. 299. Greer also stated that Wilson-Smith was a "criminal" who had "been to prison most of his life." Tr. 296.

{¶41} Third, we turn to examining the physical evidence presented at trial. Detective Stechschulte testified that, when Greer was arrested at the house where his kids lived, Chastity turned over a handgun to the police. Tr. 252. Subsequent testing established that the two shell casings that were recovered at Troy's house were fired from this weapon. Tr. 232. Ex. 43. However, Greer testified that this handgun had been "stashed" under his porch by Dyson. Tr. 293. He stated that, after he learned of the whereabouts of the gun, he hid it in the ceiling tiles above his back porch. Tr. 293. Greer testified that he told Tyson to get the gun but that Tyson never came to retrieve the firearm. Tr. 293-294.

{¶42} In summary, three witnesses identified Greer as being present at Troy's house on July 12, 2021. All three of these witnesses had met Greer prior to that morning. The jury was made aware of the criminal histories and drug usage of these three individuals. The consistency of their accounts of the incident was also the subject of extensive cross-examination. While Greer denied ever being in Troy's house, the jury was free to believe his testimony or the testimony of the State's witnesses. *Hooper*, *supra*, at ¶ 29.

{¶43} Further, on the recording of his conversation with Wilson-Smith, Greer can be heard making statements that described the events that occurred in Troy's house on the morning of July 12, 2021. The two shell casings located at in Troy's house were fired by a handgun that was found in Greer's possession. While the Defense asserted that Greer provided explanations as to why this evidence did

not link him to the offenses at Troy's house, the finders of fact were free to disbelieve Greer's testimony and draw different conclusions from those advocated by Greer.

**{¶44}** For these reasons, the record demonstrates that Greer's convictions are not against the manifest weight of the evidence. Since the record contains no indication that the jury lost its way in reaching these verdicts, the sole assignment of error is overruled.

*Conclusion*

**{¶45}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Allen County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and MILLER, J.J., concur.**

**\*\* Judge Gene A. Zmuda of the Sixth District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**